JACOBS & BARBONE, P.A.
A Professional Corporation
Attorneys at Law
1125 Pacific Avenue
Atlantic City, New Jersey 08401
(609) 348-1125
Attorneys for Plaintiff
jacobsbarbone@comcast.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HEIDI CLAYTON,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CITY OF ATLANTIC CITY, CHIEF OF POLICE JOHN MOONEY, DEPUTY CHIEF OF POLICE JOSEPH NOLAN, LIEUTENANT GREGORY VANDENBERG<br><br>　　　　Defendants. | Civil Action No.<br><br>Civil Action<br><br><br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF TRIAL COUNSEL** |

Plaintiff HEIDI CLAYTON, a resident of Atlantic County, New Jersey, complaining against Defendants, says:

## JURISDICTION

1. This action is brought pursuant to 42 U.S.C. §1983, §1988 and upon the United States Constitution, including, the First and Fourteenth Amendments. Jurisdiction is founded upon 28 U.S.C. §1331 and §1343 and the aforementioned statutory and constitutional provisions. Plaintiff further invokes the pendent jurisdiction of this Court to hear and decide any claim arising under State law pursuant to the Court's supplemental jurisdiction codified at 28 U.S.C. §1367.

1

## VENUE

2.      Venue lies in the United States District Court, for the District of New Jersey, pursuant to 28 U.S.C. §1391.

## PARTIES

3.      Plaintiff HEIDI CLAYTON, was at all times relevant to this Complaint, a citizen of the United States and resident of the State of New Jersey.

4.      Defendant CITY OF ATLANTIC CITY is a municipal corporation organized and existing under the laws of the State of New Jersey and was, at all times relevant hereto, the employer of all individually named defendants.

5.      Defendant JOHN MOONEY, Chief of the Atlantic City Police Department, did, through his action and inaction and through his command supervisors fail to train and supervise and did otherwise create, establish, and allow the practice and policy within the police department detailed below.  He is sued individually and in his official capacity.

6.      Defendant JOSEPH NOLAN is a Municipal Police Officer, who has achieved the rank of Deputy Chief within the Atlantic City Police Department and did, at all times relevant hereto, act under color of State law in his alleged performance of official duty, and is sued individually and in his official capacity.

7.      Defendant GREGORY VANDENBERG is a Municipal Police Officer, who has achieved the rank of Lieutenant within the Atlantic City Police Department and did, at all times relevant hereto, act under color of State law in his alleged performance of official duty, and is sued individually and in his official capacity.

2

## FIRST COUNT

1.  Plaintiff HEIDI CLAYTON, was, at all times relevant hereto, employed by Defendant CITY OF ATLANTIC CITY as a police officer doing her job with an industrious and conscientious fervor.

2.  During the year of 2006 Defendant DEPUTY CHIEF JOSEPH NOLAN was involved in a vehicle pursuit at which time he used a canister of OC pepper spray to spray another moving vehicle from his moving vehicle.

3.  During the weeks that followed several fake reports and orders were circulated throughout the police department making light of Defendant DEPUTY CHIEF JOSEPH NOLAN's use of OC spray towards a moving vehicle.

4.  During that time Patrolman William Warner was in a dating relationship with Plaintiff HEIDI CLAYTON.

5.  William Warner and Defendant DEPUTY CHIEF JOSEPH NOLAN are friends and speak often.

6.  During many of those conversations Defendant DEPUTY CHIEF JOSEPH NOLAN expressed to William Warner that he believed that Plaintiff HEIDI CLAYTON had authored many of these fake reports and orders.

7.  Based upon that mistaken belief, Defendant DEPUTY CHIEF JOSEPH NOLAN began a campaign of discipline, harassment, retaliation, and retribution against Plaintiff HEIDI CLAYTON for which she was not given

any due process because no formal charges were filed over Defendant DEPUTY CHIEF JOSEPH NOLAN's mistaken belief.

8.      That campaign, included, but was not limited to events occurring on May 20, 2007. On May 20, 2007 at approximately 2040 hours Plaintiff HEIDI CLAYTON went to Sack O Subs approximately three blocks into the City of Ventnor and purchased a meatball sub without permission to do so.

9.      However, it was and is a common practice for officers to respond to the Wawa across the street and Plaintiff HEIDI CLAYTON believed her actions to be consistent with that practice.

10.      While waiting for her sandwich Plaintiff HEIDI CLAYTON saw Defendant DEPUTY CHIEF JOSEPH NOLAN's black Chevy Impala parking in the Wawa Parking lot with him standing on the sidewalk drinking a cup of coffee.

11.      After purchasing the sandwich Plaintiff HEIDI CLAYTON responded to the Public Safety Building where she assisted Patrolmen Calabrese and Patrolman Shapiro with processing the paperwork from a drug arrest.

12.      On May 21, 2008 Plaintiff HEIDI CLAYTON was approached by Sergeant William Allen in the first floor hallway of the Public Safety Building. Sergeant Allen directed her into the lounge area at which time he produced a copy on an inter-departmental email authored by Defendant DEPUTY CHIEF JOSEPH NOLAN. Sergeant Allen stated he wanted Plaintiff to know where this coming from and that he felt bad about it but he needed a report from her.

4

13.     Plaintiff HEIDI CLAYTON expressed to Sergeant Allen that she was rather annoyed in that she felt that Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, was making an issue of this incident because of his mistaken belief of Plaintiff's role in the fake reports and order about him that resulted in he personally did not liking Plaintiff.

14.     Sergeant Allen agreed and stated that everyone goes to Ventnor and even he had even been involved in a motor vehicle accident while going to Ventnor Wawa to get coffee.

15.     Plaintiff HEIDI CLAYTON completed a report that evening answering specific questions asked of her by then Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain. Plaintiff took the report to Sergeant Allen and returned to service.

16.     On June 21, 2007 as Plaintiff HEIDI CLAYTON was called to return to the Roll Call room. Once there Plaintiff was told that Lieutenant Frank Brennan needed to see me. Plaintiff was directed to an office where he was waiting with Sergeant. Edward Brady.

17.     Lieutenant Brennan stated that he was sorry to be seeing Plaintiff on such bad terms and then produced a Preliminary Notice of Disciplinary Action that referenced the May 20th trip to Ventnor. The form indicated that major discipline in the form a six day suspension was being sought.

18.     Lieutenant Brennan stated he would give Plaintiff a day to consider the form.

19.  Plaintiff told him a day would not be required and that she rejected the offer.  As Plaintiff had never been faced with major discipline in her prior 15-year career, Plaintiff asked him what the next procedure was.

20.  Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, subsequently indicated that he did not like the "tone" of Plaintiff's report wherein she referred to newer officers "junior" to her and that she did not apologize to him in his report which was why he was pursuing the matter further.

21.  Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, further stated that since Plaintiff had just received a written reprimand thus major discipline was now warranted.

22.  On July 22, 2007 Plaintiff was assigned to ride with a new patrolman.

23.  As Plaintiff was leaving the roll call desk, Sergeant Brady directed her to drop him off at the hospital.  Since someone else was speaking to her at the same time, Plaintiff only heard half of Sergeant Brady's request.

24.  Plaintiff turned to Sergeant Brady and stated "I'm sorry Ed, did you say drop you off now?"  Sergeant Brady responded "Yes, please".

25.  Plaintiff left Roll Call, dropped the officer off and went into service.  While on a call in the 500 block of North Kentucky Avenue, Sergeant Brady arrived.

26.  While Plaintiff was waiting for a complainant to signal her vehicle so that she could drive her around and attempt to locate her missing son, Sergeant Brady stated he needed to talk to me about something.

27.     Knowing Sergeant Brady for many years he appeared to Plaintiff to be rather uncomfortable.  Plaintiff asked him if everything was ok and he stated "Well I was sent here to talk to you about calling me Ed today."

28.     Plaintiff was at first confused and did not know what he was meant.  He went on to explain that Plaintiff had called him Ed on her way out of the door at Roll Call in front of Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, and that he was furious.  Sergeant Brady stated that Defendant DEPUTY CHIEF JOSEPH NOLAN was livid because Plaintiff set a bad example in front of all of the new officers and he wanted her punished.

29.     Plaintiff was completely shocked as it was and is common for Patrolman and Sergeants to refer to each other in person by their first names.   For example, Plaintiff has seen and even heard numerous Patrolmen referring to Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, as "BoBo", since he is more known as Bo Nolan as opposed to his given name of Joseph Nolan.

30.     Plaintiff was speechless and had nothing to say other then it would not happen again.  Sergeant Brady said nothing and left awkwardly.

31.     On August 6, 2007 as Roll Call broke, Plaintiff saw Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, lean over to Sergeant Brady and speak to him.

32.     As Plaintiff signed out a carbine rifle, Sergeant Brady asked her why she had been looking up at the ceiling with her head tilted back during roll call.

33.    Plaintiff was unaware that she had been doing so but told him that she must have been stretching her neck and relieving the tension in her neck.

34.    On August 13, 2007, Plaintiff asked Sergeant Brady to email the Atlantic City Police Department letterhead used when typing reports as she currently did not have it in her files.  Sergeant Brady did so.

35.    When Plaintiff opened the email, she saw that Sergeant Brady had inadvertently left a report he had typed then Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then Captain, regarding her.

36.    The report referenced the conversation regarding Plaintiff's neck rolling at roll call.  There was a sentence left on the end referencing something occurring on August 7, 2007.

37.    Based on that sentence and a conversation she had previously overheard, Plaintiff believed that Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, thought she had rolled her eyes during roll call on August 7, 2007.

38.    On September 20, 2007 Plaintiff received a telephone call from Captain Glenn Abrams regarding the Narcotics Unit. He asked Plaintiff if she had not put in for transfer to Vice because she did not want it or because she did not feel she was going to get it.  Plaintiff told him the latter.

39.    Plaintiff informed Captain Abrams that she did not believe that Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, would approve such a transfer if he was making issues of her calling Sergeants by their first names and rolling her neck at Roll Call.

40.     Captain Abrams assured Plaintiff that he wanted her in Vice and encouraged her to write a report requesting such a transfer.

41.     Captain Abrams stated that that Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, would not be a factor and to submit the report as soon as possible.  He assured Plaintiff of the transfer.

42.     Plaintiff told him that she would submit the report and did so that night.

43.     On September 29, 2007 Plaintiff was again contacted by Captain Abrams.  He began the conversation with "I guess you saw the orders?"

44.     Plaintiff told him that she had not, but guessed that she was not on the transfer list to Vice.  Captain Abrams stated that Defendant CHIEF JOHN MOONEY did not want to transfer her with a suspension pending against her.

45.     Captain Abrams told Plaintiff that if she would take a three day suspension for going to Ventnor and apologize to Defendant DEPUTY CHIEF JOSEPH NOLAN, she would be the next person in Vice.

46.     Plaintiff declined that offer.   Plaintiff instead responded that her arrest record should speak for itself and that she should not have to be unfairly suspended to get into Vice.    Plaintiff HEIDI CLAYTON expressed to Captain Abrams that she was rather annoyed in that she felt that Defendant DEPUTY CHIEF JOSEPH NOLAN, who was then a Captain, was making an issue of this incident because of his mistaken belief of Plaintiff's role in the fake reports and order about him that resulted in he personally did not liking Plaintiff.

9

47.    On November 30, 2007 while working an overtime detail at the Tropicana Casino, Detective Michael Mason Sr. called over the radio that he had tripped over a curb and was currently at the hospital (case #07-151962.)

48.    A few hours later Plaintiff responded to the hospital with a car-jacking victim (case #07-151987) and saw Defendant DEPUTY CHIEF JOSEPH NOLAN waiting in the emergency room.

49.    Forgetting that Officer Mason Sr. was also at the hospital, Plaintiff stood behind a Paramedic to avoid being seen by Defendant DEPUTY CHIEF JOSEPH NOLAN to avoid an unwanted confrontation.

50.    While standing Plaintiff observed Defendant DEPUTY CHIEF JOSEPH NOLAN go over to exam room number 12 and shut the door. Defendant DEPUTY CHIEF JOSEPH NOLAN then walked over to the nurse's station and spoke with two nurses seated at a desk. Defendant DEPUTY CHIEF JOSEPH NOLAN told them under no circumstances was any uniformed officers regardless of rank allowed in Officer Mason's room. Defendant DEPUTY CHIEF JOSEPH NOLAN subsequently walked away.

51.    The nurses then went on to speak to each other stating that Defendant DEPUTY CHIEF JOSEPH NOLAN can shut the door to Officer Mason's room and cover it with cement, but anyone walking past could still smell the "booze" coming from inside. One nurse went on to comment that Defendant DEPUTY CHIEF JOSEPH NOLAN was covering for his drunken friend, but one day Officer Mason might kill someone while drunk on duty.

52.    In January of 2008 Plaintiff was asked by Lieutenant Raggozine and Sergeant Maimone to be a Field Training Officer.

53.    Plaintiff expressed concerns to Sergeant Maimone that she did not want a rookie being treated unfairly because he or she was riding with her as Plaintiff felt that everything she did was scrutinized by Defendant DEPUTY CHIEF JOSEPH NOLAN and she did not think he would permit it.

54.    Sergeant Maimone assured her that both he and Lieutenant Raggozine felt that she was one of the best police officers on the shift and it would be a shame not to allow me to be a FTO.

55.    Sergeant Maimone then added her to a list of officers selected and informed her that she would have to attend a four hour course being held at 0800 to 1200 hours on January 31, 2008.

56.    Plaintiff physically saw the list and saw that it appeared listed in order of Seniority with her name directly at the top.  The last name on the list was Patrolman Charles Heintz, the officer with the least amount of seniority.

57.    On January 30, 2008 the order for the Field Training Officer Class was issued.  Missing from the order was Plaintiff's name and Officer Heintz's name.

58.    Officer Heintz immediately spoke with Sergeant Maimone who assured him that he had submitted his name was going to attempt to contact Defendant DEPUTY CHIEF JOSEPH NOLAN, who had been responsible for the order.

59. When speaking to Plaintiff about her name being left off of the list he simply looked at her and stated "I am going to tell him what he is doing is wrong. He should not be fucking with you like this."

60. Plaintiff told Sergeant Maimone that she appreciated his efforts, was not surprised by her name being left off of the list, and was most disappointed in the fact that Defendant DEPUTY CHIEF JOSEPH NOLAN in an effort to not look like he was obviously targeting her had strategically left Officer Heintz off of the list as he (Heintz) was clearly excited and looking forward to being a field training officer.

61. At approximately 2100 hours Sergeant Maimone called Plaintiff on her cell phone and announced that it took "some doing" but Defendant DEPUTY CHIEF JOSEPH NOLAN finally did the right thing and both Heintz and she would be added to the list.

62. On April 4, 2008 while completing reports for a drug arrest Patrolman Armstrong and Plaintiff were told by Sergeant Cooke and Sergeant Brubaker that they could no longer conduct surveillance without first obtaining permission from a sergeant.

63. Plaintiff was later told by Sergeant Scanlon that Defendant DEPUTY CHIEF JOSEPH NOLAN had brought Plaintiff up in a Monday morning meeting at which the entire upper echelon of the Police Department was present.

64.     The conversation was that Bravo Platoon's manpower shortage could not be as severe as presented if "a certain officer still does drug surveillance all night getting officers tied up on drug arrests."

65.     This clearly referenced Plaintiff out of the group of officers.

66.     From that date forward, Plaintiff complied with the order requesting permission to elevated surveillance.  However, she chose to conduct most surveillance operations from the interior of her patrol vehicle.

67.     On May 11, 2008 while in the Detective Bureau on CDS arrest 08-055954 Detective Mason Sr. came to the computer where Plaintiff was typing.

68.     Plaintiff smelled a very strong odor of alcoholic beverage coming from his breath.  Plaintiff asked him why he was working and he told her that he was on overtime.

69.     Detective Mason then went on tell Plaintiff that they needed to talk about "BoBo".

70.     Plaintiff told Detective Mason that she was not stupid and knew that he and Defendant DEPUTY CHIEF JOSEPH NOLAN were close friends.

71.     Detective Mason told Plaintiff that were best friends, but he now hated him.  He went onto explain that back in November he went to the hospital with a "problem" and Defendant DEPUTY CHIEF JOSEPH NOLAN showed up unannounced and uninvited.  Defendant DEPUTY CHIEF JOSEPH NOLAN read his chart without his (Mason's) permission and later went on to discuss his medical condition with Deputy Chief Henry

White.  Mason stated he confronted Defendant DEPUTY CHIEF JOSEPH NOLAN on airing his business and that he had not spoken to him since.

72.     Detective Mason further told her that he had gone to see a lawyer in Cherry Hill about suing Defendant DEPUTY CHIEF JOSEPH NOLAN for violating his HIPA rights, but was asked by his brother Councilman Dennis Mason not to sue him.

73.     Regarding Plaintiff, Detective Mason Sr. stated he told Defendant DEPUTY CHIEF JOSEPH NOLAN after hearing he had "done paper on me" that he was a jerk off for trying to suspend Plaintiff because she was good girl.  Defendant DEPUTY CHIEF JOSEPH NOLAN responded by stating "She's a douche bag and will get what she deserves."

74.     Detective Mason stated he tried to stop Defendant DEPUTY CHIEF JOSEPH NOLAN from torturing Plaintiff but that Defendant DEPUTY CHIEF JOSEPH NOLAN "hates you" and can't help himself".  He also adds that he (Mason) and Defendant DEPUTY CHIEF JOSEPH NOLAN go to Sack O'Subs "all the time" while on duty.

75.     On June 16, 2008, Plaintiff arrived at Roll Call to find News Cameras, Defendant CHIEF JOHN MOONEY, Defendant DEPUTY CHIEF JOSEPH NOLAN, Deputy Chief Jubilee, and Deputy Chief White present.

76.     On this date Patrolman Berrios was being sent to Iraq and his last roll call was to be aired on the news.

77.     Plaintiff was aware that Defendant DEPUTY CHIEF JOSEPH NOLAN was present and attempted to draw no attention to her.

78.     While standing at roll call, Plaintiff noticed that Defendant DEPUTY CHIEF JOSEPH NOLAN was staring at her making very uncomfortable, despite Officer Berrios standing at the opposite end of the room. Patrolman Anderson and Maslow comment on this as roll call broke.

79.     Plaintiff attempted to look away or look at the floor or wall to avoid being accused of rolling her eyes.

80.     On that same date Plaintiff was called to the Police Compound by Lieutenant Brady.

81.     Upon arrival Plaintiff finds Sergeant Kevin Scanlon waiting for her and she was led to the Lieutenant's office at which point she was asked if she remembered roll call. Naturally Plaintiff did recall roll call.  Plaintiff was asked if she remembered how she stood.  Plaintiff stated no but inquired of what she had been accused of doing.  Lieutenant Brady explained that Defendants CHIEF JOHN MOONEY and DEPUTY CHIEF JOSEPH NOLAN were furious that she stood at Roll Call with her arms folded across her chest.  Lieutenant Brady went on to ask Plaintiff if everything was "ok" in Plaintiff's life.

82.     Lieutenant Brady told Plaintiff that Defendants CHIEF JOHN MOONEY and DEPUTY CHIEF JOSEPH NOLAN stated that if she was that unhappy in patrol, they could find a less desirable position for her.

83.     Lieutenant Brady told her that he had noticed at roll call that she often looked at the bulletin board or the floor.

84. Plaintiff could not have been more offended. Plaintiff asked them both who and where this was coming from. Plaintiff stood at roll call on that date as she stood every date.

85. Plaintiff admitted not looking front as she was afraid that Defendant DEPUTY CHIEF JOSEPH NOLAN was going to accuse her of rolling her eyes or stretching her neck.

86. Plaintiff informed them both that this latest counseling session had crossed the line from critical of her job performance to a personal attack.

87. Plaintiff asked them both what rule she had broken by standing with arms folded across her chest. Plaintiff was unaware of a rule or regulation that prevented her from standing in the manner that she did.

88. Plaintiff made it clear that she objected to being singled out for disproportionate counseling compared to other officers, especially in light of the fact that she felt that Defendant DEPUTY CHIEF JOSEPH NOLAN was making an issue of this incident because of his mistaken belief of Plaintiff's role in the fake reports and order about him that resulted in he personally did not liking Plaintiff.

89. The next day at roll call various male officers that had asked Plaintiff why she was counseled stood Roll Call with their arms folded across their chest.

90. None of the participating male officers, Patrolman Paul Maslow, Jeff Dungan, William Anderson, or Franco Sydnor were called out or counseled about their body language.

91.     These male officers continued in a variety of experiments for the balance of the week and took turns standing in various poses with not one comment being directed to them regarding their stance or body language.

92.     At the July 3, 2008 Roll Call, Captain Fair stood roll call at which time he addressed roll call with his arms folded across his chest.  He was neither singled out nor counseled.

93.     On November 18, 2008 Plaintiff was told by Police Communications to telephone Captain Brennan.  Upon doing so Plaintiff was told by Captain Brennan that her disciplinary issue about going into Ventnor for a sandwich had been on the Chief's desk for "weeks" and he finally decided that she was to be suspended for one day.

94.     Captain Brennan further stated that the Chief was willing to allow her to serve the suspension in the form of a monetary fine.  He explained that this would involve Plaintiff coming to work, but still losing the day's pay.

95.     Plaintiff told him that if she was not getting paid, she would not be coming to work.

96.     Plaintiff then asked Captain Brennan if she could serve her suspension in the same manner afforded to Detective Ray Ellis who was permitted to serve his five day suspension one day a month for five months.  Plaintiff asked for one hour a week for eight weeks.  Captain Brennan stated that would not be possible.

97.     Captain Brennan then stated that he was sorry things had gone this far, wished he could have done something to stop it, and he felt that Plaintiff

17

was one of the best Police Officers on the Police Department.  Finally he told Plaintiff not to let this get her down.

98.   Plaintiff told Captain Brennan that she felt as if I had been treated extremely unfair by Defendant she felt that Defendant DEPUTY CHIEF JOSEPH NOLAN was making an issue of this incident because of his mistaken belief of Plaintiff's role in the fake reports and order about him that resulted in him personally not liking Plaintiff.  Plaintiff also noted that since this incident, she had been singled out by Defendant DEPUTY CHIEF JOSEPH NOLAN for her body language and other issues

99.   On November 19, 2008 as Plaintiff was leaving Roll Call, Lieutenant Brady stated "Heidi can I see you for a minute."  They respond to his office where he told Plaintiff that he had received an email from Captain Brennan directing him to schedule her suspension day with him.

100.   The meeting ended with Plaintiff choosing December 25, 2008 as her suspension date.

101.   On November 24, 2008 while leaving Roll Call Plaintiff was approached by Captain Fair regarding her choice of suspension dates.  Captain Fair informed her that he was going to speak with Defendant DEPUTY CHIEF JOSEPH NOLAN and ensure that she was permitted to serve the suspension on that date.

102.   In approximately the second or third week of October 2008, Sergeant Edward Pollock called for Plaintiff's location and met her in the 200 block of Florida Avenue at approximately 2100 hours.  He told her that he had

been given the task of checking on log sheets and several of her log sheets were missing. He directed Plaintiff which dates to re-do and told her "I don't care what you write on them as long as you turn one in, these things are useless." Plaintiff complied and has since completed a log sheet in the same fashion that she previous had for 15 years.

103. On November 11, 2008 Sergeant Richard Andrews met Plaintiff in the McDonald's Parking lot and handed her a log sheet stating that Lieutenant Brady was not happy with her log sheets because all of the boxes were not filled in. Boxes left empty were summons related (moving, parking, ordinance issued.)

104. Sergeant Andrews stated that there were not enough calls on the sheet. He had also provided Plaintiff with a computer generated log sheet obtained through the CPLIMS record system indicating specifically what calls she had been sent to.

105. Upon reviewing same Plaintiff pointed out to him that she was disregarded to several of those calls and does not write calls to which she does not go to on the log. He agreed and stated to fill out the empty boxes and submit the log.

106. Plaintiff entered zeroes into the summons boxes and re-submitted the log sheets again.

107. On November 17, 2008 at approximately 1630 hours Sergeant Edward Pollock called Plaintiff to the compound. When Plaintiff arrived she went

to the Sergeant's Office where he was seated. Also present was Sergeant Curtis Williams.

108. Sergeant Pollock showed Plaintiff a log sheet from November 12, 2008. He handed the sheet to Plaintiff and was clearly livid yelling "can you read this? What does this say?"

109. Plaintiff took the log and read exactly what was written and handed it back to him. He then asked Plaintiff why there was only one entry on the log sheet. Plaintiff explained that on that date with permission from Sergeant Andrews, she conducted surveillance on the area of South Carolina and Baltic Avenues and after other units made the arrests from her surveillance, she responded to the Detective Bureau to complete reports. Technically, the surveillance was one call for the entire night.

110. Sergeant Pollack told Plaintiff to re-write the log sheet. Plaintiff re-wrote the log sheet in his and Sergeant Williams' presence.

111. Sergeant Pollack then shouted for Plaintiff to respond to Michigan and Atlantic Avenues for a traffic post until he told her to secure. Plaintiff remained at the traffic post until 2100 hours. At that time Sergeant Pollack arrived and shouted that he was missing a log sheet from October 29th and to go re-do it.

112. Plaintiff attempted to explain that she was certain that she already had turned it in, but he pulled away "peeling wheels" as he did.

113. On November 22, 2008 at 2122 hours Plaintiff was called to the compound by Sergeant Brubaker.  Plaintiff arrived and again responded to the Sergeant's office where present again was Sergeant Curtis Williams.

114. Sergeant Brubaker showed Plaintiff a log sheet written by her and asked her what was going on.

115. Plaintiff asked him what he meant and he said her log sheets were a mess.  Also he noted that Plaintiff failed to write Roll Call and her dinner break on them.  He stated that Plaintiff could not write "TCO'd " (short for taken care of) as an action taken for each call.  He pointed to an entry where the call was "shoplifting arrest," the location was Bally's Casino, and the action taken was TCO'd.   He looked and Plaintiff and asked "what does that mean?"  Plaintiff told him what it meant.  He went onto explain that she had already been told by Sergeant Andrews that she have to fill in all of the boxes on the log sheet and he added that her logs sheets are "a mess."  He told her that on the log sheets the action taken portion of the log sheet was meant for a "detailed explanation" of the call handled.  He added that log sheets were going to save her as Police Communications rarely types in the over the air disposition of the call correctly.

116. Plaintiff explained that for 15 years she had not written Roll Call or dinner break on her logs sheets nor had she been "detailed" as often the times written on the log sheets were in conflict with the times calls are actually dispatched/arrived/cleared.  Plaintiff went on to tell him whatever he wants written on the log she will write it as she was rather embarrassed that as a

senior officer she was being called in again for log sheets when she had
done them the same way for such a long time.

117. Upon clearing, Plaintiff logged the time called and the time cleared to the
compound. Plaintiff wrote on the log sheet for action taken that she was
counseled on the importance of log sheets and that she was ordered to be
more detailed.

118. Later Plaintiff spoke with Patrolman John Devlin who stated he had only
been spoken to once about the log sheets, but only because a day or two
were missing. He stated he wrote "TCO'd" for nearly everything, but was
not told he needed to be detailed. Nor was he or Patrolman James
Miltenberger punished with a traffic post despite telling Plaintiff that they
had been accused of missing more than one day of turning in log sheets.

119. On November 26, 2008 Plaintiff arrived to Roll Call at 1600 hours dressed
in plain clothes as she was ordered the night prior. After filling in her
name in the first call, Plaintiff was told by Sgt. Brubaker that her
assignment that evening was "One-Bravo."

120. Since her return to patrol in 2006, the majority of her assignments had
been in district three, specifically three-Charlie. Plaintiff immediately felt
that she was about to be disciplined. Plaintiff was also told in front of the
entire shift to "stand by after roll call."

121. As all of the other officers are leaving they all asked Plaintiff "what did you
do?" and "call your lawyer" it sounds like you are in trouble.

122.  Sergeant Brubaker told Plaintiff to go to the Sergeant's office. Plaintiff complied and sat in the Sergeant's office. As all of the sergeants were walking past, they shook their heads and kept going. Plaintiff left the Sergeant's office and called PBA president David Davidson. He immediately responded.

123.  The meeting began with Sergeant Brubaker holding a log sheet written by Plaintiff in front of her face and telling her that this is going to stop. Sergeant Falcone walked in and shut the door, and told Plaintiff that he was done with her and she has become the problem of the shift, that she has become the patrolman that no one wants to be around and that all of the supervisors were sick of her.

124.  Sergeant Falcone further told Plaintiff that he would have no problem suspending her. Plaintiff told them before this continues she had called David Davidson to be present as she felt discipline was about to be initiated. Sergeant Brubaker stated "That's fine because this is going to be a one way conversation." Brubaker made it clear that this log sheet issue was going to be documented and he was going to "put it on paper."

125.  Moments later Dave Davidson arrived. He walked in and was immediately told to leave by Sergeant Falcone. Dave Davidson told him he has the right to be there because of <u>Weingarden</u>.

126.  Sergeant Falcone responded that he did not as it was just a counseling session.

127.    The "counseling session" lasted for one and half hours.  During that time Sergeant Falcone told Plaintiff that she was "passive-aggressive" and was writing sloppy log sheets to needle (makes a hand motion) all of the sergeants and make them angry.  He told Plaintiff that he was going to take the bull by the horns and the first chance he had to suspend her, he was going to do it.  And when he does it, he is "going to do me right and then I am going to need Dave Davidson."  He further told Plaintiff that he was going to find the rules and regulations on log sheets and make sure she was following them.

128.    At this point in the conversation he was looking on the department web site for the rules on log sheets.  As Plaintiff had already researched the topic and clearly he had not prior to this "counseling" session, Plaintiff told him that there is no order on log sheets in the rules and regulations.

129.    Sergeant Brubaker pointed Plaintiff's attention to her log sheets.  He told her that she should know better than to turn in sloppy logs and that she again left roll call and the carbine she had been issued off of one her log sheets.  He further stated that he did not like that she documented his last counseling session on her log sheet.  He also did not like that she wrote what she ate for dinner after logging her dinner break on her log sheet. He then stated that Plaintiff turned a log sheet in that had one entry on it and that what she should have done was logged on the sheet what other officers had done during the surveillance.

130.   At approximately 2200 hours on the same date, Sergeant Kevin Scanlon called for Plaintiff.  They met at the Surf Stadium where he told Plaintiff that the date for her suspension had been denied and she was ordered to pick another date, where December 7th was chosen.

131.   On December 1, 2008 while walking through the Detective Bureau, Deputy Chief Jubilee stopped Plaintiff and asked why she had decided to take a suspension day and not a monetary fine.  Plaintiff explained to him that she was not going to come to work and not get paid.  He appeared confused and asked what she meant.  Plaintiff told him what had been explained to her by Captain Brennan.

132.   As she explained, Deputy Chief Jubilee began shaking his head from side to side and was saying "no, no, no."  He went onto explain that he had provided in his written statement as hearing officer that he allowed for Plaintiff to forfeit an equivalent of eight hours of pay and Plaintiff should have been able to forfeit a vacation or sick day.  Plaintiff told him she was unaware that she could do that.  He stated that two male officers had recently been allowed to do just that.  He then referenced William Wentz and Joseph Kelly.  He then told Plaintiff to have her lawyer contact Frank Brennan as she should be afforded the same choice.  Present during this conversation was Patrolman Franco Sydnor.

133.   On December 3, 2009 at approximately 1900 hours Sergeant  MacCready met Plaintiff on the south block of Sovereign Avenue and informed her that Defendant CHIEF JOHN MOONEY had decided that her suspension day

was to be December 9, 2008.  Plaintiff asked why then it was so urgent that she choose a date when he was just going to choose a date himself. Sergeant MacCready stated that he was just the messenger and admittedly had no knowledge of the incident

134.  On December 4th, 2008 at approximately 1630 hours, Plaintiff was called to Roll Call by Sergeant Pollock.  He informed Plaintiff that Captain Brennan was on his way to serve her with her suspension papers.  While waiting for Captain Brennan, Sergeant Pollock asked Plaintiff why she was in District One.

135.  On December 9, 2008 while in the holding cell area eating dinner, Patrolman Scott Fenton asked Plaintiff how much longer she was going to be punished in district one.  Plaintiff responded that she was not sure, but maybe until the New Year.   Sergeant Pollock was also present.  He turned to Plaintiff and said that is what he had heard earlier in the night.

136.  Plaintiff asked him if he was serious and he nodded yes stating he was told:  "fuck her keep her in one for the rest of the year."

137.  Plaintiff was assigned to district one for over a month.  This prevented Plaintiff from making drug arrests which resulted in a financial loss as she could not make grand jury overtime.

138.  Plaintiff started typing her log sheets and using the specific times she was sent to calls as logged by Police Communications to avoid her log sheets being deemed sloppy.

139. Plaintiff was told by Sergeant Williams that the other Sergeants were now angry that she was typing the sheets. Plaintiff asked him why as they were now neat and correct leaving no room for error. He stated they thought she was doing it to needle them.

140. After the above writings were made public as a result of an Unfair Labor Claim Plaintiff and the PBA have filed were made public, Plaintiff was then returned to district three.

141. On New Year's Eve of 2008 Plaintiff was telephoned by Sergeant Scanlon and told to re-submit a report turned in on December 23rd as the original had been "folded." Plaintiff was to re-submit an unfolded report.

142. On New Year's Eve after Plaintiff and several other officers (all male) participated in friendly banter over "channel four" (a channel designated for officers to speak with other officers), various officers were making jokes over this channel. During the banter Plaintiff joked with Patrolman Bouffard that she was going to egg James Armstrong's house on the way home for sneaking in a vacation day. The next day in front of the entire Roll Call, Sergeant Falcone made mention that channel four was out of control the night before and it was not funny for a certain officer to mention throwing eggs at another officer's house since the Defendant DEPUTY CHIEF JOSEPH NOLAN was working and listening to the radio and complained. Plaintiff was then changed from district three to one as punishment.

143. None of the male officers who were on channel four along with Plaintiff were spoken to nor were their assignments changed.

144. On February 26, 2009, Plaintiff was called to Internal Affairs where she met with Lieutenant Ralph Meyers and Sergeant Lushina. Also present was PBA President David Davidson. Discussed was the PERC document which detailed all of the discipline Plaintiff received since being caught in Ventnor in 2006.

145. This document was previously received in the Chief's office in November 2008.

146. However suddenly after the PERC hearing it became pertinent that Internal Affairs interview Plaintiff regarding the document.

147. Plaintiff made it clear to both Internal Affairs investigators that she was not making a complaint with Internal Affairs and did not wish to address her issues with them. Plaintiff was told that she had no choice and Sergeant Cohen would be contacting her to schedule an interview. Since then Plaintiff has been to Internal Affairs on multiple occasions to discuss the document.

148. On March 16, 2009 at approximately 2355, Plaintiff was at the Police Compound securing her rifle and vehicle key for the evening. The entire shift was secured by Sergeant Mulhern. Plaintiff turned the items into Sergeant Verseput.

149. As Plaintiff started to drive away, she was stopped by Sergeant Williams, who asked her whether she was wearing her work issued knit hat. Plaintiff

told him that she was wearing the hat, but it was so large that when getting done work she often has to roll the hat up to avoid sliding down on top of her eye glasses.

150. Sergeant Williams stated that Plaintiff was going to have to get new hat. Plaintiff state that she would when time affords to do so and left.

151. As Plaintiff drove home she wondered why after seeing her nearly daily wearing the ACPD correctly did Sergeant Williams ask her about her hat after being secured.

152. Plaintiff telephoned Sergeant Williams and asked him what prompted the question. He stated that Defendant LIEUTENANT GREGORY VANDENBERG saw her turning in her things and was livid about the way she was wearing her hat. He related that months prior to this night at approximately 2:00 a.m. when Plaintiff worked late and also turned her things in with her hat rolled up, that Defendant LIEUTENANT GREGORY VANDENBERG wanted to make an issue of it then.

153. Plaintiff asked if Defendant LIEUTENANT GREGORY VANDENBERG had the right to question her appearance at all since she had been secured for the evening and was no longer responsible for taking calls and could leave the city limits let alone get changed. Plaintiff also pointed out that it was common practice for numerous officers to remove various pieces of their uniforms (shirts, gun belts, vests, etc.....) prior to turning guns/keys in.

154.   Sergeant Williams stated that Defendant LIEUTENANT GREGORY
       VANDENBERG's argument was that technically she was still being paid
       and answered to him and he wanted to "do paper on [her]."

155.   Plaintiff told him that she rarely had time during her day to get to the
       uniform shop, but if permitted to go after roll call the following day, she
       would get a new hat.

156.   Defendant LIEUTENANT GREGORY VANDENBERG had made sexual
       advances on Plaintiff during the year of 1999 when she baby sat his
       children and he was friends with her ex fiancée Eric Dooley.  Plaintiff did
       not report the advances at that time for fear of retaliation.

157.   After those advances fizzled, Defendant LIEUTENANT GREGORY
       VANDENBERG treated Plaintiff significantly different and their friendship
       was tense at best.

158.   Plaintiff did not directly work for Defendant LIEUTENANT GREGORY
       VANDENBERG until the spring of 2006 when she was transferred from
       Juvenile Investigations to Bravo Patrol.  That was his first opportunity to
       have supervisory control over her.

159.   Prior to her first tour of duty on Bravo, Plaintiff contacted the administrative
       officer on Bravo Patrolman Maimone to discuss days off.

160.   Patrolman Maimone stated that Plaintiff was an "extra body" and could
       have whatever days off her seniority gave her.

161.   At the time Plaintiff was fifth or sixth in seniority and asked for Friday &
       Saturday off.  Patrolman Maimone checked the schedule and approved

the days off.   As was past practice within the police department

Patrolman Maimone being the "house mouse" or the administrative officer

was responsible for making such decisions.

162.   The first week Plaintiff worked Bravo, she showed up for work on that

Thursday to work.  Defendant LIEUTENANT GREGORY VANDENBERG,

who was then a Sergeant, asked what she was doing there.  Plaintiff told

him she was working and he stated that she was off.

163.   Plaintiff told him Patrolman Maimone had given her Fridays and Saturdays

off .  His reply was "this ain't juvenile you get whatever days off we give

you."   Plaintiff reminded him that she had been given Friday and

Saturday.  He stated that they were her old days off and to go home.

164.   Plaintiff asked to speak with Captain Abrams.  Defendant LIEUTENANT

GREGORY VANDENBERG, who was then a Sergeant, stated he was off,

even though seconds later he walked in.

165.   The following week as Plaintiff entered roll call, then Defendant

LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant,

threw a stack of vacation card at Plaintiff telling her again she was not in

Juvenile anymore and that she needed to start burning up all of her

vacation time.

166.   Plaintiff told him that she intended to do so but since her transfer came

mid-year and he had changed her days off she would need to take a

series of Saturdays off to attend dog shows that she entered prior to the

days off switch.

167. Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, told Plaintiff that was not how it worked in patrol and she could not take single days off, but had to take blocks of five days.

168. Plaintiff was informed by numerous other male officers that they had been told that they were not being held to choosing five day blocks.

169. Plaintiff again asked to speak with Captain Abrams regarding the issue as she found Defendant LIEUTENANT GREGORY VANDENBERG , who was then a Sergeant, to be quite hostile towards her.  He denied Plaintiff's request but told her to write a report about why she needed to take her vacation time in blocks of one.  Plaintiff did so and as she was submitting it to him, Captain Abrams emerged from his office and asked Plaintiff what was going on.  Plaintiff explained the situation to him and he quickly skimmed the report.  He tossed it Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, and said "give her whatever she needs, you already changed her days off."

170. The next several weeks Plaintiff was assigned to district one and two and told that she did not get special preference since she came to Bravo in the middle of the year.

171. Plaintiff asked Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, and Sergeant Cohen why she was assigned to the less busy districts as well as given the County Jail run (an assignment often given to rookies) when those transferred mid-year from Vice and Patrolman Bennett recently transferred from the Detective Bureau were

allowed to pick their districts, early or late in preference, as well as being assigned steady patrol cars.

172. Plaintiff was told by Sergeant Cohen he would do his best, but could not make any promises.

173. Plaintiff was sent to a call one evening in the 500 block of Tennessee Avenue to check a female. On scene is the Animal Control Officer, Sam, who was picking up a stray pit bull. As Plaintiff was active in the dog community, Sam and Plaintiff spoke often. Also present was Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant.

174. Officer Sam stated that he noticed that Plaintiff was in uniform a lot lately. Plaintiff told him that she has been transferred back to Patrol, a transfer that she had not wanted. Officer Sam asked if the transfer was a punishment or a step down. Before Plaintiff could respond Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, shouted "It is for some people like her. Some people think Patrol is beneath them and have been taken care of their whole careers."

175. As Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, said this, he was looking at Plaintiff.

176. Weeks later, Defendant LIEUTENANT GREGORY VANDENBERG, who was then a Sergeant, was transferred to the Training Unit and Plaintiff was suddenly provided with a study vehicle and placed in district three.

177.    Approximately June 22, 2008, Plaintiff was securing after a late arrest. Present at Roll Call was Defendant LIEUTENANT GREGORY VANDENBERG and Sergeant Hall.

178.    During her tour of duty that evening Plaintiff was involved in a violent fight with a suspect that resulted in Plaintiff getting punched in the face, head, and body numerous times.  Defendant LIEUTENANT GREGORY VANDENBERG made derogatory comments about Plaintiff and her involvement in said fight.

179.    On May 26, 2009 Plaintiff was informed by Internal Affairs that Defendant DEPUTY CHIEF JOSEPH NOLAN had raised the issue of her being fit for duty and asked them to investigate it.

180.    Plaintiff HEIDI CLAYTON voiced her concern on multiple occasions and objected on multiple occasions that the actions of Defendant DEPUTY CHIEF JOSEPH NOLAN were retaliation for his mistaken belief that Plaintiff was involved in submitting fake reports and fake orders about him and that she was being retaliated against and disciplined without due process and without the ability to defend herself.  Plaintiff also reported on multiple occasions that she was being retaliated against for making an unfair labor complaint against Defendants.

181.    Upon making her complaints, instead of taking them seriously, Plaintiff HEIDI CLAYTON became the subject of increased discipline and ridicule.

182.    The acts visited upon Plaintiff HEIDI CLAYTON were pretextual with the true facts being that Defendants CITY OF ATLANTIC CITY by and

through Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG were retaliating against Plaintiff HEIDI CLAYTON due to her repeated complaints as detailed above.

183.　　Rather than properly investigate her complaints and rectify the harassment and retaliation visited upon Plaintiff HEIDI CLAYTON, Defendant CITY OF ATLANTIC CITY did nothing.

184.　　Defendant CITY OF ATLANTIC CITY and/or Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG, was and is, at all times relevant to this matter, an employer defined by N.J.S.A. 34:19-2.

185.　　Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG were supervisory employees within Defendants CITY OF ATLANTIC CITY with the authority to direct or control the work of Plaintiff HEIDI CLAYTON and were supervisors of Plaintiff HEIDI CLAYTON pursuant to N.J.S.A. 34:19-2(d).

186.　　Defendant CITY OF ATLANTIC CITY by and through Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG did take retaliatory action against Plaintiff HEIDI CLAYTON because of her disclosure to supervisors of activities that she believed to be in violation of law, rule or regulation promulgated pursuant to law, and/or because of her objecting to activities she reasonably believed were incompatible with a clear mandate of public

policy concerning the public health, safety or welfare, including, adverse employment action or due to her filing an unfair labor practice complaint.

187.    Defendants did, individually and collectively, retaliate against Plaintiff HEIDI CLAYTON for her lawful disclosures by taking adverse employment action against Plaintiff HEIDI CLAYTON in the terms and conditions of her employment, as more specifically set forth above.

188.    As a result of the aforementioned actions of Defendants, Plaintiff HEIDI CLAYTON has suffered both economic and non-economic damages and has otherwise been irreparably injured.

WHEREFORE, Plaintiff HEIDI CLAYTON demands judgment against Defendants individually, jointly and severally as follows:

A.    An injunction to restrain continued violation of the New Jersey Conscientious Employee Protection Act;

B.    Immediate reinstatement and restoration to office, namely the same position held by Plaintiff prior to the retaliatory action of Defendants or an equivalent position;

C.    Full reinstatement of fringe benefits and seniority rights;

D.    Full reinstatement and back pay constituting compensation for lost wages, benefits and other remuneration;

E.    Payment by defendants of the reasonable costs of this action and for attorneys' fees;

F.    Compensatory damages;

G.    Punitive damages;

H.    The assessment of a Civil Penalty as allowed by law;

I.    Any other relief allowed under the Conscientious Employee Protection Act; and

J.    Any other relief that the Court deems equitable and just.

## SECOND COUNT

1.    Plaintiff repeats and incorporates all previous allegations as if fully set forth herein.

2.    At all times relevant to this matter, Defendant CITY OF ATLANTIC CITY was at all times relevant hereto an employer as defined by N.J.S.A. 10:5-12(a).

3.    Starting in or about 2006, Defendant CITY OF ATLANTIC CITY, by and through Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG commenced a pattern and practice of unwelcome and unwanted sexual harassment and retaliation based exclusively upon Plaintiff's gender to a degree so persuasive as to alter the conditions of employment of Plaintiff and create an abusive and hostile working environment.

4.    Defendants CITY OF ATLANTIC CITY, by and through Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG did, by virtue of its inaction, perpetrate unlawful sexual harassment against Plaintiff HEIDI CLAYTON pursuant to N.J.S.A. 10:5-12(b) and did proximately cause Plaintiff HEIDI CLAYTON to suffer severe and permanent injuries and damages.

WHEREFORE, Plaintiff demands Judgment against Defendants as follows:

A.  Compensatory damages;

B. Punitive damages;

C. Interest, attorney's fees and costs of suit; and

D. Any other relief that the Court deems equitable and just.

### THIRD COUNT

1.      Plaintiff repeats and incorporates all previous allegations as if fully set forth herein.

2.      Defendant CITY OF ATLANTIC CITY, was at all times relevant hereto an employer of Plaintiff pursuant to N.J.S.A. 10:5-12(a).

3.      Defendants CITY OF ATLANTIC CITY did notwithstanding direct reports of Plaintiff regarding pervasive and continuous sexual harassment failed to take any remedial action on behalf of Plaintiff and did, notwithstanding actual and constructive notice of that sexual harassment, failed to in any way protect or take any action on behalf of Plaintiff.

4.      Defendants CITY OF ATLANTIC CITY did perpetrate unlawful sexual harassment employment practices to the detriment of Plaintiff, and did proximately cause Plaintiff to suffer severe and permanent injuries and damages aforenoted.

WHEREFORE, Plaintiff demands Judgment against Defendants as follows:

A. Compensatory damages;

B. Punitive damages;

C. Interest, attorney's fees and costs of suit; and

D. Any other relief that the Court deems equitable and just.

## **FOURTH COUNT**

1. Plaintiff repeats and incorporates all previous allegations as if fully set forth herein.

2. Plaintiff HEIDI CLAYTON was and is at all times relevant hereto a dedicated lifetime public servants initially appointed to the position of police officer pursuant to New Jersey statutes, specifically <u>N.J.S.A.</u> 40A:14-147, and has performed as permanent member of the Atlantic City Police Department, having done so through industrious, conscientious and meritorious service.

3. Plaintiff HEIDI CLAYTON is by virtue of her position within the Atlantic City Police Department, tenured permanent members that may not be suspended, removed, fined, reduced in rank or otherwise disciplined either directly, indirectly, or by virtue of unofficial personnel reassignments, alleged reorganization placement, or by reconstitution or redefinition of job position, duty and responsibilities, for political reasons, in retaliation for faithful performance of duty or for any other cause other then incapacity, misconduct or disobedience to the rules and regulations of the Police Department or the laws of the State of New Jersey.

4. Plaintiff HEIDI CLAYTON does, by virtue of statutory grant under the law of the State of New Jersey, maintain a property and liberty interest in his respective employment, and is therefore protected by the Fourteenth Amendment to the United States Constitution.

5. Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG were, at all times relevant

hereto, supervisory police officials within the Police Department of Defendant CITY OF ATLANTIC CITY and the ultimate supervisors of Plaintiff HEIDI CLAYTON.

6. Plaintiff HEIDI CLAYTON made certain statements by way of a filed Unfair Labor Practice Complaint concerning what she believed to be disparate treatment between ranks within the Police Department of Defendant CITY OF ATLANTIC CITY as it relates to enforcing the Rules and Regulations of the Police Department.

7. Defendant CITY OF ATLANTIC CITY thereafter by and through Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG planned, orchestrated and implemented a series of personnel and administrative actions, including starting unnecessary internal affairs investigations against for the purpose of utilizing their power and authority under color of state law in order to punish Plaintiffs HEIDI CLAYTON based upon their personal animus towards Plaintiff HEIDI CLAYTON for lawful actions and the exercise of his constitutional rights.

8. The purpose of Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG to punish, retaliate and otherwise intentionally and recklessly deprive Plaintiff HEIDI CLAYTON of his federally protected property and liberty interests in employment is based upon exercise of her First Amendment constitutional rights and other constitutional rights hereinbefore enunciated such as

disciplining her without due process under the mistaken belief she was involved in issuing fake reports and fake orders.

9. Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG by virtue of the aforenoted actions and conduct, singled out and targeted Plaintiff HEIDI CLAYTON for political and personal animus, intentionally and/or recklessly for the purpose to harm and retaliate against Plaintiff HEIDI CLAYTON by exercise of their power and authority under color of state law and thereby proximately depriving Plaintiff HEIDI CLAYTON of her property and liberty interests in employment by so substantially altering the terms and conditions of his employment, by economically damaging Plaintiff HEIDI CLAYTON in terms of both wages, seniority and emoluments of his office, and otherwise damaging her.

10. The aforementioned retaliation continues through today.

WHEREFORE, Plaintiff HEIDI CLAYTON demands judgment against Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG pursuant to 42 U.S.C. §1983 as follows:

A.      Compensatory damages;

B.      Punitive damages; and

C.      Interest, attorney's fees and costs of suit pursuant to 42 U.S.C. §1988.

### FIFTH COUNT

1. Plaintiff HEIDI CLAYTON repeats and incorporates the allegations of the previous Counts as if fully set forth herein.

41

2.  The aforementioned actions of Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG violated Plaintiff HEIDI CLAYTON's right to free speech and free expression, her right to due process, and her right to freedom of association, guaranteed by the First, Fourth, Eighth, Ninth and/or Fourteenth Amendments of the United States Constitution rendering said Defendants liable to Plaintiff HEIDI CLAYTON pursuant to 42 U.S.C. §1983.

3.  As a result of the aforementioned actions, Plaintiff HEIDI CLAYTON sustained temporary and permanent emotional injuries and endured and will endure great pain and suffering.

WHEREFORE, Plaintiff HEIDI CLAYTON demands judgment against Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG pursuant to 42 U.S.C. §1983 as follows:

A.    Compensatory damages;

B.    Punitive damages; and

C.    Interest, attorney's fees and costs of suit pursuant to 42 U.S.C. §1988.

## SIXTH COUNT

1.  Plaintiff HEIDI CLAYTON repeats and incorporates the allegations contained in the previous Counts as if fully set forth herein at length.

2.  At any and all times herein mentioned, defendant CITY OF ATLANTIC CITY was responsible for the hiring, supervision, control, instruction, and/or training of its

supervisory officials, specifically Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG.

3. Defendant CITY OF ATLANTIC CITY was deliberately indifferent to the constitutional rights of Plaintiff HEIDI CLAYTON by failing to adequately train its municipal police supervisory officials, specifically Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT GREGORY VANDENBERG, by failing to equip them with specific tools necessary to handle recurring and predictable situations such as the one involving Plaintiff HEIDI CLAYTON.

4. As a result this failure to adequately train its municipal officials pursuant to 42 U.S.C. §1983, Plaintiff HEIDI CLAYTON has been damaged.

WHEREFORE, Plaintiff HEIDI CLAYTON demands judgment against Defendant CITY OF ATLANTIC CITY as follows:

      a.     Compensatory damages;

      b.     Punitive damages;

      c.     Attorneys' fees and litigation costs pursuant to 42 U.S.C. §1988; and

      d.     Any and all other relief the Court may deem equitable and just.

## SEVENTH COUNT

1. Plaintiff HEIDI CLAYTON repeats and incorporates the allegations contained in Counts One through Four as it fully set forth herein at length.

2. Upon information and belief, at all relevant times herein, Defendants CHIEF JOHN MOONEY, DEPUTY CHIEF JOSEPH NOLAN AND/OR LIEUTENANT

GREGORY VANDENBERG were executing the policy and/or custom of Defendant CITY OF ATLANTIC CITY in its handling, disciplining, and supervision of Plaintiff HEIDI CLAYTON.

3. The aforementioned policy and/or custom was such that it was deliberately indifferent to the constitutional rights of employees, including Plaintiff HEIDI CLAYTON.

4. As a result of the aforementioned policy or custom, Plaintiff HEIDI CLAYTON has been damaged.

WHEREFORE, Plaintiff HEIDI CLAYTON demands judgment against Defendant CITY OF ATLANTIC CITY as follows:

a.   Compensatory damages;

b.   Punitive damages;

c.   Attorneys' fees and litigation costs pursuant to 42 U.S.C. §1988; and

d.   Any and all other relief the Court may deem equitable and just.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Arthur J. Murray, Esquire, as trial counsel in the within matter.

## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38(b) and 48, Plaintiff hereby demands trial by jury in accordance with those rules as to all issues.

JACOBS & BARBONE, P.A.

BY:     /s/ Arthur J. Murray
Arthur J. Murray

Dated: June 22, 2009

## CERTIFICATION

The undersigned counsel certifies that there is no other action or arbitrations pending or contemplated involving the subject matter of this controversy at this time and there are no additional known parties who should be joined to the present action at this time. I certify the foregoing to be true.  I am aware that if the foregoing statements made by me are willfully false, I am subject to punishment.

JACOBS & BARBONE, P.A.

By:     /s/ Arthur J. Murray
Arthur J. Murray

Dated: June 22, 2009