UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HEIDI CLAYTON,

        Plaintiff,

   v.

CITY OF ATLANTIC CITY, et al.,

        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 09-3045 (JEI)

**OPINION**

**APPEARANCES:**

JACOBS & BARBONE, PA
By:   Arthur J. Murray, Esq.
1125 Pacific Avenue
Atlantic City, NJ 08401
(609) 348-1125
    Counsel for Plaintiff

RUDERMAN & GLICKMAN, ESQS.
By:   Steven Samuel Glickman, Esq.
675 Morris Avenue
Suite 100
Springfield, NJ 07081
(973) 467-5111
    Counsel for Defendants City of Atlantic City, Joseph Nolan,
and Gregory Vandenberg

LEVINE, STALLER, SKLAR, CHAN, & DONNELLY, PA
By:   John M. Donnelly, Esq.
     Brian J Cullen, Esq.
3030 Atlantic Avenue
Atlantic City, NJ 08401-6380
(609) 348-1300
    Counsel for Defendant John Mooney

**IRENAS**, Senior District Judge:

    Plaintiff Heidi Clayton, an Atlantic City police officer,

brings this civil rights/ discrimination/ whistleblower suit

against the City of Atlantic City and the following Atlantic City
Police Department officers: Police Chief John Mooney ("Mooney"),
Deputy Police Chief Joseph Nolan ("Nolan"), and Lieutenant
Gregory Vandenberg ("Vandenberg").  Clayton brings this action
pursuant to 42 U.S.C. §§ 1983 and 1988, the New Jersey
Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1
et seq., and the New Jersey Law Against Discrimination ("NJLAD"),
N.J.S.A. 10:5-1 et seq.  Mooney presently moves to dismiss the
claims against him (Counts I, II, IV and V) pursuant to Fed. R.
Civ. P. 12(b)(6).  The City of Atlantic City, Nolan, and
Vandenberg join Mooney's motion.

**I.**

Clayton, a patrolman for the Atlantic City Police
Department, alleges that from 2006 to 2009[1], she has been the
victim of gender discrimination and retaliation. Her lengthy, and
somewhat disorganized, Complaint details a series of incidents
where Clayton was criticized or ridiculed by her superiors.  In
summary, Clayton makes the following allegations: (1) her
superiors treated Clayton differently than male officers and
subjected her to a hostile work environment; (2) Vandenberg, who
had previously made sexual advances towards Clayton, singled her

---

[1] The last incident alleged in the Complaint occurred on May
26, 2009.  In Clayton's brief in opposition to this motion, she
clarifies that Defendants' "pattern of tortious conduct . . .
continues through the present day."  (Opp'n Br. at 30.)

2

out and treated her with hostility; (3) Nolan, who disliked Clayton because he believed she had authored fake reports mocking him, repeatedly targeted Clayton; (4) Clayton went without permission to the City of Ventnor to get a sandwich, and was subsequently disciplined by Mooney, resulting in a one-day suspension without pay; (5) Plaintiff repeatedly complained about Nolan's targeting her, and eventually filed a "'unfair labor' claim against Defendants"; (6) after filing her "unfair labor" claim, Clayton experienced further harassment.  A detailed account follows.

## A.  Factual Background

In 1999, Vandenberg had made sexual advances towards her, but she did not report him for fear of retaliation.  Since that time, their relationship was "tense at best."  (Compl. ¶ 157.) In the Spring of 2006, Clayton was transferred to Bravo Patrol, and for the first time was under the supervisory control of Defendant Vandenberg, who was at that time a Sergeant.  While under his command, Vandenberg treated Clayton with great hostility.

Prior to joining Bravo Patrol, the administrative officer had allowed Clayton to schedule Friday and Saturday off. However, during Clayton's first week as part of Bravo Patrol, Vandenberg abruptly changed her days off.  He later "threw a stack of vacation card [sic]" at Clayton and told her she needed

3

to use her vacation time.  Vandenberg then refused Clayton's request to take vacation in single days, telling her she needed to take her vacation in five-day blocks.  In contrast, male officers had been informed that they did not have to abide by the five-day block policy.  Eventually, a captain instructed Vandenberg to let Clayton take her vacation in the manner she wanted.  (Compl. ¶ 165-169.)  In the following weeks, Clayton as assigned to district one and two.  Being assigned to district one had a financial impact on Plaintiff, as it prevent her from making drug  arrests, and subsequently making grand jury overtime.[2]  (Compl. ¶ 137.) In contrast to Clayton, other recent transfers were able to select their districts and assigned to steady patrol cars.  (Compl. ¶ 170-171.)  When Vandenberg was transferred to another unit, however, Plaintiff was suddenly given a steady vehicle and a better district assignment -- district three.[3]  (Compl. ¶ 176.)

Also in 2006, Defendant Nolan began a "campaign of discipline, harassment, retaliation and retribution against [Clayton]."  (Compl. ¶ 7.)  Nolan had used pepper spray against a moving vehicle during a vehicular pursuit.  Afterward, fake

---

[2]  Additionally, Plaintiff was assigned County Jail run, even though that assignment often given to rookies.  (Compl. ¶ 171.)

[3]  Further, at some point, Vandenberg shouted in front of Clayton that her transfer to Bravo Patrol could be seen as a punishment.  (Compl. ¶ 174.)

4

reports and orders mocking his behavior circulated through the
police department.  Nolan believed that Clayton had authored the
mocking reports.  As will be explained further, in the years that
followed, Nolan repeatedly singled Clayton out for punishment and
criticism, and Clayton repeated complained that she was being
targeted because of Nolan's belief she had authored the false
reports.

On May 20, 2007, Clayton traveled without permission to the
City of Ventnor to purchase a sub at the Sack O Subs, a
restaurant located across from a Wawa store from which Atlantic
City Police Officers frequently responded to calls.  Nolan, who
was in the Wawa parking lot, spotted Clayton at the Sack of Subs.
(Compl. ¶ 10)  When Clayton returned to the station, Clayton was
asked by Sergeant Allen to write up a report explaining her
Ventnor trip.  Although officers often went to Ventnor without
issue, Nolan had sent an email about the incident, and Sergeant
Allen was obligated to ask Clayton to write up the incident.
(Compl. ¶ 12, 14.)  Clayton completed the requested report.

On June 21, 2007, Clayton received a Preliminary Notice of
Disciplinary Action for her May 20th Ventnor trip.  The Notice
indicated that major discipline in the form of a six day
suspension was being sought.  Later, Nolan informed Clayton that
he was pursuing the incident because she hadn't apologized to him
in her report and he disliked her tone.  Clayton decided to

oppose the Notice.

In the months that followed, Clayton was singled out for the discipline, criticism, and was blocked from taking on various career opportunities, as described below:

- In July 2007, Clayton was reprimanded for calling a sergeant by his first name.  Even though such informality was common practice between patrolmen and sergeants, Clayton was still reprimanded, because Nolan had witnessed Clayton address the sergeant informally and was "livid."  (Compl. ¶ 28.)

- In August 7, 2007, Nolan thought Clayton rolled her eyes during Roll Call, when she in fact had merely been stretching her neck.  Clayton's worries that Nolan was upset about the allege eye-rolling was confirmed, when she discovered a report to Nolan that Sergeant Brady had inadvertently left open on a computer.  The report referenced the August 7th "eye rolling" incident.  (Compl. ¶ 31-37.)

- In September of 2007, Clayton applied to transfer to the Vice unit.  Mooney blocked Clayton from transferring to Vice because she had a suspension pending against her arising out of the Ventnor incident.  Clayton was told that if she addressed the Ventnor incident by taking a three day suspension and apologizing to Nolan, she would be the next person transferred to Vice.  Clayton refused the offer. (Compl. ¶ 38-46.)

- On November 20, 2007, Clayton, while in the hospital, witnessed Nolan covering for his friend and fellow officer, who had had a drunken accident.  (Compl. ¶ 47-51.)

- In January of 2008, Nolan initially blocked Clayton's assignment to be a Field Training Officer, but was eventually persuaded to allow her to be assigned. (Compl. ¶ 52-60.)

- In March of 2008, Sergeant Williams questioned Clayton about how she wore her hat, because it upset Vandenberg.  Clayton's work-issued knit hat was too large and she sometimes rolled it. Vandenberg had previously spotted Clayton wearing her hat rolled while she turned in her gun and keys for the evening, and he wanted "to make an issue of it."  (Compl. ¶ 148-152.) Clayton questioned the validity of this critique, as it was common practice for officers to remove parts of their uniform prior to turning their gun and keys in. (Compl. ¶ 153.)

6

- In April 2008, Nolan made a snide comment about Clayton's surveillance work at a meeting with the upper echelon of the Police Department.  (Compl. ¶ 62-66.)

- On June 16, 2008, Clayton noticed Nolan staring at her at Roll Call.  Uncomfortable, she avoided his gaze.  Later, she learned that Mooney and Nolan were furious with her because she had folded her arms during Roll Call.  Further, she heard Mooney and Nolan had said if Clayton were "unhappy in patrol, they could find a less desirable position for her."  (Compl. ¶ 82.)  After this incident, various male officers crossed their arms during Roll Call and were not criticized.  (Compl. ¶ 91-92.)

- On June 22, 2008, Clayton arrived at Roll Call after having been involved in fight with a violent suspect. Vandenberg made derogatory comments about Clayton and her involvement in the fight.  (Compl. ¶ 177-178.)

At the end of October in 2008, Clayton's log sheets came under scrutiny by her supervisors. In the following weeks, Sergeant Richard Andrews, Sergeant Edward Pollock, Sergeant Curtis Williams, and Sergeant Brubaker, on various occasions, criticized Clayton's completion of her log sheets, even though she had completed her sheets in the same manner for years. Further, Sergeant Brubaker criticized her for writing "TCO'd" on her logs, although a male patrolman wrote "TCO'd" on his logs, but had not been reprimanded.

At around the same time the Sergeants were reprimanding Clayton about her logs, Mooney finally made a decision on the Ventnor issue, which had been on his desk for weeks.  On November 18, 2008, Captain Brennan informed Clayton that Mooney had determined that she would be punished by a one day suspension

without pay for her Ventnor trip.  However, she could also take
the suspension in the form of a monetary fine.  Since a male
detective had been permitted to serve a five-day suspension in
one day increments for five months, Clayton asked if she could
serve hers in one hour increments over eight weeks. Captain
Brennan denied her request.  (Compl. ¶ 93-96.)  On November 19,
2009, Clayton was asked to select a suspension date, and she
chose December 25, 2008.  (Compl. ¶ 99-100.)

On November 26, 2008, Sergeant Brubaker punished Clayton by
assigning her to a district one, where she was less likely to be
able to earn grand jury overtime.  Sergeant Brubaker also called
Clayton into a "counseling session" to discuss her log sheets.[4]
Sergeant Falcone, who was also present at the meeting, accused
Clayton of being "passive-aggressive" and "writing sloppy log
sheets to needle" the Sergeants.  (Compl ¶ 127.)  Later that day,
Clayton was also informed that she had been denied her chosen
date for the Ventnor incident suspension, and she was ordered to
select another date. (Compl. ¶ 130.)

Contrary to what she had been told earlier, on December 1,
2008, Clayton learned that she should have been given the choice
between a day's suspension or forfeiting a vacation or sick day.

---

[4]  Concerned about the meeting,  Clayton phoned the
Policeman's Benevolent Association ("PBA") president David
Davidson, who promptly came to join Clayton in the meeting.
However, Sergeant Falcone, who had joined the meeting, made
Davidson leave.

(Compl. ¶ 132.)  On December 3, without warning, another choice was taken from her.  A sergeant informed Clayton that Mooney had decided that, despite Clayton's selection, her suspension day would be December 9, 2008.  (Compl. at 133.)

Although the timing is unclear in the Complaint, it appears that in November or December of 2008, Clayton and/or the PBA made an "unfair labor" claim before the New Jersey Public Employee Relation Commission ("PERC").  (Compl. ¶ 145-6.)  Although the Complaint is littered with references to the "unfair labor" claim, as Clayton admits, the Complaint remains vague as to what the claim addresses, who authored it, and whether it remains pending. While the Complaint uncertain as to what issues Clayton raised in her PERC claim, it included: incidents surrounding Clayton's log sheets (Compl. ¶ 140), "all the discipline Clayton received since being caught in Ventnor in 2006," Clayton's claim that Nolan covered up a fellow officer's drunkenness and subsequent hospitalization, and "disparate treatment between ranks" (Compl. Count IV ¶ 6).  After Clayton made her "unfair labor" claim, she was transferred back to the district she preferred.  (Compl. ¶ 140.)

After Clayton's suspension, the harassment is alleged to have continued, as follows.

- On December 31, 2008, Clayton was asked to resubmit a report, merely because the report had been folded.  (Compl. ¶ 141.)

- On January 1, 2009, at Roll Call, Sergeant Falcone criticized

9

Clayton for making an inappropriate comment on the police
radio.  Sergeant Falcone singled out Clayton, even though she
and other officers, all of whom were male, had all been joking
on the radio.  Sergeant Falcone told Clayton that Nolan had
listened to the radio and had complained about her comment.
As punishment, Clayton was transferred again to district one
(Compl. ¶ 142.)

- Starting on February 26, 2009, Internal Affairs interviewed
  Clayton multiple times regarding her PERC complaint.  On May
  26, 2009, Internal Affairs informed Clayton that Nolan had
  asked them to investigate whether she was fit for duty.

## B.  Instant Action

On June 23, 2009, Clayton filed the instant seven-count

action.  She alleges that all Defendants took retaliatory action

against her in violation of the New Jersey Conscientious Employee

Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq. (Count I).  She

also brings two claims pursuant to the New Jersey Law Against

Discrimination ("NJLAD"), N.J.S.A. 10:5-12(a)[5], alleging that all

Defendants "perpetrate[d] unlawful sexual harassment" against her

(Count II), and that the City of Atlantic City "perpetrate[d]

unlawful sexual harassment employment practices to the detriment

of Clayton." (Count III).

Clayton also brings three claims pursuant to 42 U.S.C. §

1983, alleging that Mooney, Nolan, and/or Vandenberg deprived

Clayton of her "property and liberty interest in employment by so

substantially altering the terms and conditions of his [sic]

---

[5] Although Clayton asserts Count II pursuant to N.J.S.A.
10:5-12(b), it appears that this is a typo and she intended to
bring the claim pursuant to N.J.S.A. 10:5-12(a).

employment" (Count IV); that Mooney, Nolan and/or Vandenberg violated her "right to free speech and free expression, her right to due process, and her right to freedom of association, guaranteed by the First, Fourth, Eighth, Night, and/or Fourteenth Amendments of the United States Constitution" (Count V); and that the City of Atlantic City "was deliberately indifferent to the constitutional rights of Clayton . . . by failing to adequately train its municipal police" (Count VI).  Finally, Clayton alleges that the City of Atlantic City had a "policy and/or custom of . . . handling, disciplining, and supervis[ing]" its employees that was "deliberately indifferent to the constitutional rights of employees" (Count VII).  Clayton does not explain under which law Count VII is being brought.  Clayton seeks damages, as well as fees and costs pursuant to 42 U.S.C. § 1988.[6]

## II.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  In order to survive a motion to dismiss, a complaint must allege facts that raise a right to relief above the speculative level.  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P.

---

[6] With regard to her CEPA claim, Clayton also seeks injunctive relief, reinstatement of office, fringe benefits and seniority rights, and back pay.  However, Clayton has not alleged that she lost her position, seniority rights, or back pay.

8(a)(2).  While a court must accept as true all allegations in the plaintiff's complaint, and view them in the light most favorable to the plaintiff, *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008), a court is not required to accept sweeping legal conclusions cast in the form of factual allegations, unwarranted inferences, or unsupported conclusions. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  The complaint must state sufficient facts to show that the legal allegations are not simply possible, but plausible. *Phillips*, 515 F.3d at 234.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).[7]

---

[7]  This Court has federal question subject matter jurisdiction over the present suit, *see 28* U.S.C. § 1331, based on Clayton's claims brought pursuant to 42 U.S.C. § 1983.  The Court exercises supplemental jurisdiction over the state and/or common law claims, *see* 28 U.S.C. § 1367.

Mooney argues that this court lacks primary jurisdiction, because PERC has been granted "exclusive jurisdiction" over unfair employment practices, generally concerning issues arising out of collective negotiations.  *See* N.J.S.A. 34:13A-5.4(c). However, at this stage, it appears that Plaintiff's claims do not fall under PERC's exclusive jurisdiction.  *See Peterson v. City of Long Branch*, No. 08-3452, 2009 WL 749589, *9 (D.N.J. Mar. 19, 2009) (holding PERC did not have jurisdiction over plaintiff's NJLAD and federal constitutional claims).

Mooney further argues that, as a jurisdictional matter, the Complaint must be dismissed because Clayton has failed to exhaust her administrative remedies before PERC, under general principles

**III.**

**1.  CEPA Claim (Count I)**

With regard to Clayton's CEPA claim, Mooney argues that the Complaint fails to state a claim for a CEPA violation.[8]  Mooney contends that Plaintiff's allegations amount to nothing more than private labor issues, and that her PERC claim merely addressed a private labor dispute.  A CEPA plaintiff must prove four elements:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity . . .; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt,* 177 N.J. 451, 462 (2003).  Clayton cannot

---

of exhaustion.  Although it is apparent Clayton has brought some form of complaint before PERC, the precise nature of the claim is unclear.  At this stage, the Court cannot find that it is precluded from considering the claims for exhaustion reasons.  Furthermore, "exhaustion is not a prerequisite to the assertion of a § 1983 retaliation claim." *LaPosta v. Borough of Roseland*, 309 Fed. App'x 598, 601 n.1 (3d Cir. 2009) (unpublished); *see Patsy v. Bd. of Regents of Florida*, 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing a state action pursuant to § 1983.").  The Court addresses exhaustion in the context of Clayton's procedural due process claim in a later section.

[8]  Mooney also argues that the CEPA claim is barred by CEPA's one-year statute of limitations.  As the Court has granted Mooney's motion on other grounds, it need not address this argument.

establish the third and fourth prongs of this test.  In essence,
Clayton's is that she filed an "unfair labor claim" and then
Defendants retaliated against her by continuing to harass her.
The facts, as set out above, do not plead "factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Ashcroft v.
Iqbal*, 129 S. Ct. at 1949 (2009).  The Court cannot discern,
other than personalized gripes, what actions Clayton described in
the claim.  Further, it cannot determine with certainty when
Defendant filed the complaint, who authored the complaint, and/or
if the grievance procedures are ongoing.  Without alleging that a
she performed a whistle-blowing activity, Clayton's claim cannot
precede.

Further, even if Clayton made out that she performed a
whistle-blowing activity, she could not show a causal connection
between her activity and Defendants' purported retaliation.
Other than timing, which itself suspect because it is uncertain
when the "unfair labor" claim was filed, Plaintiff has not
alleged any facts that could lead to an inference of causation.
Instead, Clayton avers that Nolan had been harassing her because
of his personal animus for some time, and then, after the filing,
continued to harass her.  There is no reason to believe his
continued harassment was caused by the filing.  Similarly,
Clayton has not offered any facts to suggest that any of the

discrimination or targeting that occurred after she initiated the grievance proceedings wasn't merely a continuation of the long-standing pattern of harassment.  *See Carver v. City of Trenton*, 420 F.3d 243, 257 (3d Cir. 2005) (holding that generalized harassment is not unlawful retaliation under CEPA).  Accordingly, Defendants' Motion to Dismiss the CEPA claim will be granted. The claim will be dismissed without prejudice.[9]

## 2.  § 1983 First Amendment Retaliation Claim (Counts IV)

In Count II, Clayton brings a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983 against the City of Atlantic City and the individual defendants.[10]  Mooney argues that this claim should be dismissed because Clayton cannot allege that her conduct involved protected speech concerning a matter of public concern.[11]

The Court finds that at this stage, Clayton has not

---

[9]  The Court cautions Clayton that if she pursues her CEPA claim, she runs the danger of waiving her NJLAD claim.  N.J.S.A. 34:19-8.

[10]  It appears Clayton brings this claim against the individual defendants in both their official and personal capacities.  However, absent waiver by the state, the Eleventh Amendment prohibits suits for damages in federal court against state officials sued in their official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *see also, Quern v. Jordan*, 440 U.S. 332, 345 (1979).  Accordingly, Clayton may only bring her claims against defendants in their personal capacities.

[11]  Mooney also argues that the § 1983 claim is barred by the statute of limitations.  As the Court has granted Mooney's motion on other grounds, it need not address this argument.

sufficiently alleged the elements of a § 1983 First Amendment retaliation claim.  To do so, plaintiff must show: "(1) he engaged in protected speech, (2) the defendant took adverse action sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the adverse action was prompted by plaintiff's protected speech.  *Wilson v. Zielke*, No. 09-2607, 2010 WL 2144292, *1 (3d Cir. May 28, 2010) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).  To be protected speech, the speech must involve "a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 147 (1983).  This test is very similar to the four-part test for analyzing a CEPA claim.  *See Espinosa v. County of Union,* 212 Fed. App'x 146, 153 (3d Cir. 2007) (unpublished).  Here, Clayton's First Amendment claim arises out of the same events giving rise to her CEPA claim.  At this stage, the Court finds Clayton has not alleged facts sufficient to establish she was involved in speech involving a matter of public concern.

Defendants' Motion to Dismiss the § 1983 First Amendment retaliation claim will be granted.  This claim will be dismissed without prejudice.

## 3.  § 1983 Procedural Due Process Claim (Count V)

In Count V, the Complaint purportedly brings a § 1983 claim for violations of Clayton's rights under "the First, Fifth, Eighth, Ninth and/or Fourteenth Amendments."  (Compl. Count V.)

16

However, Clayton clarified in her opposition brief that she
intends to assert a § 1983 due process claim under Count V,
alleging that she was "disciplined without proper due process".[12]
(Opp'n Br. at 13, 16.)  Mooney interprets this vague accusation
as a procedural due process claim, and the Court will follow
suit.  Mooney argues that Clayton's procedural due process claim
should be dismissed because, as a member of a police union and as
a civil servant, Clayton had access to various procedures, but
she has not alleged she has availed herself of these remedies.

A two-stage analysis is employed to determine a procedural
due process claim under 42 U.S.C. § 1983: "(1) whether the
asserted individual interests are encompassed within the
fourteenth amendment's protection of life, liberty, or property;
and (2) whether the procedures available provided the plaintiff
with due process of law."  *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d
Cir. 2000) (internal quotation marks and citations omitted).
Defendant only contests whether "due process of law" was
provided.

Here, Clayton is a member of a police union and has filed a
grievance before PERC related to the issues that form the basis
of the case.  "[A] state cannot be held to have violated due

---

[12]  Additionally, in her opposition, Clayton for the first
time suggests an there has been an invasion of her privacy and
reputation interests.  As these alleged violations were not
alleged in the Complaint, the Court will not address them.

process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Id.* Further, the Third Circuit has held that "grievance procedures outlined in collective bargaining agreements can satisfy due process requirements." *Dykes v. Se. Pa. Transp. Auth.,* 68 F.3d 1564, 1572 n.6 (3d Cir. 1995); *see also*, *Skrutski v. Marut*, 288 Fed. App'x, 803, 809 (3d Cir. 2008) (holding police officer's suspension without pay did not violate procedural due process, when officer had initiated grievance procedures) (unpublished). Thus, there is no violation of due process under these circumstances. Accordingly, Defendants' Motion to Dismiss § 1983 procedural due process claim will be granted. This claim will be dismissed without prejudice.

### 4. NJLAD Claims (Counts II and III)

Mooney argues that the NJLAD claim against him must be dismissed because Clayton conceded in her opposition brief that liability against Mooney could only be premised on a theory of aiding and abetting, but Clayton did not assert such a claim in the Complaint. The Court agrees. In her opposition brief, Clayton clarified that her NJLAD claim against Mooney is based on a theory of his aiding and abetting under N.J.S.A 10:5-12(e) (Opp'n Br. at 16); however, the Complaint does not assert an aiding or abetting claim. As such, Plaintiff's NJLAD claim against Mooney is dismissed without prejudice. As "individual

18

liability for a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism," the individual claims against Nolan and Vandenberg are also dismissed without prejudice. *Cicchetti v. Morris County Sheriff's Office*, 194 N.J. 563, 594 (2008).

With regard to the remaining NJLAD claims against the City of Atlantic City, the City of Atlantic City makes two arguments: (1) Clayton failed to allege she was a member of a protected class as required to make a NJLAD discrimination claim; and (2) the claim is barred by NJLAD's two-year statute of limitations.  The Court will address each in turn.  The City of Atlantic City's first argument fails as Clayton has alleged that she was discriminated against because of her gender – a protected class under NJLAD. *See* N.J.S.A. 10:5-3.

As to its statute of limitation argument, there is ample evidence of gender discrimination and the creation of a hostile workplace within the two-year statute of limitations.  This is sufficient for Clayton to state a claim.  At this stage in the litigation, the Court need not determine whether the claim extends to incidents prior to this two-year period under the "continuing violation" doctrine, or whether such incidents could be introduced as evidence.

Accordingly, with regard to the NJLAD claims against the

City of Atlantic City, the Motion to Dismiss is denied.

**4.  § 1983 "Failure to Train" Claim (Count VI)**

In Count VI, Clayton alleges that the City of Atlantic City has "fail[ed] to adequately train its municipal officials" in violation of 42 U.S.C. § 1983.  The City of Atlantic City has not directly addressed Count VI.  Accordingly, to the extent that it seeks to have the claim dismissed, the City of Atlantic City's motion is denied.

**5.  "Policy Indifferent to the Constitutional Rights of Employees" Claim (Count VII)**

Similarly, the City of Atlantic City has not directly addressed Count VII.  In Count VII, Plaintiff asserts that the City of Atlantic City executed a policy that was deliberately indifferent to the constitutional rights of employees.  However, the Complaint does not specify which constitutional rights the policy offended, nor whether the claim is brought pursuant to 42 U.S.C. § 1983.  As such, in Count VII, plaintiff has not plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949 (2009). Accordingly, Count VII shall be dismissed without prejudice.

**IV.**

For reasons set forth above, the Court will grant the Motion to Dismiss with respect to the following claims: Count I (CEPA claim), Count II (NJLAD sexual harassment claim) with respect to the claims against Mooney, Nolan, and Vandenberg; Count IV (§ 1983 First Amendment retaliation claim), Count V (§ 1983 procedural due process claim), and Count VII (policy indifferent to constitutional rights claim).  These claims shall be dismissed without prejudice.  However, the Court will deny the Motion with respect to the following claims: Count II (NJLAD sexual harassment claim) with respect to the claim against the City of Atlantic City, Count III (NJLAD sexual harassment employment practices claim), and Count VI (§ 1983 failure to train claim). The Court will grant Clayton leave to file a motion to amend the Complaint with respect to any claim dismissed without prejudice. The Court will issue an appropriate order.


Date: June  30, 2010



        s/ Joseph E. Irenas
      JOSEPH E. IRENAS, S.U.S.D.J.



21