```
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| HEIDI CLAYTON,<br><br>           Plaintiff,<br>      v.<br><br>CITY OF ATLANTIC CITY, et al.,<br><br>           Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 09-3045<br>            (JEI/JS)<br><br>**OPINION** |

**APPEARANCES:**

JACOBS & BARBONE, PA
By:   Arthur J. Murray, Esq.
1125 Pacific Avenue
Atlantic City, NJ 08401
     Counsel for Plaintiff

RIDGEWAY & RIDGEWAY
By:   Brian D. Heun, Esq.
P.O. Box 277
15 Shore Road
Linwood, NJ 08221
     Counsel for Defendant

**IRENAS**, Senior District Judge:

    Plaintiff Heidi Clayton, an Atlantic City police officer, initiated this action pursuant to 42 U.S.C. §§ 1983 and 1988, the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.[1]  Plaintiff claims that she was the victim of sexual harassment and gender

---

    [1] The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 23 U.S.C. § 1343, and 28 U.S.C. § 1367.

1

discrimination.  Pending before the Court is Defendant City of Atlantic City's ("Atlantic City") Motion for Summary Judgment.

### I.

Since 1994, Plaintiff has been a member of the Atlantic City Police Department ("ACPD"), where she currently remains employed. (Def.'s 56.1 Stat. ¶ 2, Feb. 17, 2012.)[2]  Plaintiff contends that during the course of her employment, she experienced sexual harassment and gender discrimination by Lieutenant Gregory Vandenberg, Deputy Chief Joseph Nolan, and Chief John Mooney.

In 1999, Plaintiff alleges that Vandenberg made several sexual advances towards her, which Plaintiff declined.  (Pl.'s S.A.M.F. ¶¶ 1-10, June 25, 2012.)[3]  According to Plaintiff, these advances included asking Plaintiff on several dates, massaging Plaintiff's foot on his leg near his genitals in a jacuzzi while on vacation, and reading Plaintiff a love poem over the phone. (Id. at ¶¶ 1, 3, 7, 9.)  At the times Plaintiff asserts these incidents occurred, Vandenberg was Plaintiff's superior, but not her direct supervisor.  (Id. at ¶ 2.)  Vandenberg denies all of these incidents ever occurred.  (Pl.'s Opp., Ex. E at 25-29.)

---

[2] References to "Def.'s 56.1 Stat." are to Defendant's statement of undisputed material facts submitted in support of their Motion.

[3] References to "Pl.'s S.A.M.F." are to Plaintiff's Statement of Additional Material Facts which accompanied Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment.

In 2006 or 2007, Plaintiff was transferred and Vandenberg became her direct supervisor. (Id. at ¶ 29; Pl.'s Opp., Ex. E at 29.) In the period after this transfer, Plaintiff claims that Vandenberg was motivated by retaliation for Plaintiff's rejection of his sexual advances when he changed her requested days off, despite Plaintiff's contention that seniority entitled her to her requested days. (Pl.'s S.A.M.F. ¶ 94; Pl.'s Opp at 9.) Vandenberg also required Plaintiff to use her vacation time in blocks of five days instead of her requested blocks of two, even though according to Plaintiff no other officer was required to do the same. (Pl.'s S.A.M.F. ¶ 97.) Finally, Vandenberg singled Plaintiff out for uniform violations during muster time.[4] (*Id.* ¶ 58-62.) According to Plaintiff, no other officers were ever reprimanded for similar conduct.[5] (*Id.*)

---

[4] "Muster time" refers to the last fifteen minutes before the end of an officer's shift, during which the officer turns in his/her equipment and prepares to go home.

[5] Plaintiff testified that she witnessed the following uniform violations by male officers during muster time go unpunished: (1) Officer Paul Maslow wore a sweatshirt over his uniform; (2) Officers Jeff Dungan, Rusty Bouffard, and Rob Nawrockie wore t-shirts; (3) Officers Victor Garofolo and Sterling Wheaten wore only underwear; (4) Officer Al Floriani took off his gun belt and jacket; and (5) Officer Don Tomasello wore blue jeans and a baseball hat. (Pl.'s S.A.M.F. ¶ 59.) In addition, Plaintiff testified that female Officer Eileen Fernald took off her gun belt and wore her hair down but was not punished, (*Id.*) and that female officer Dawn Riggs was not punished for wearing a pony tail. (*Id.* ¶ 62.)

Vandenberg offers non-discriminatory explanations for his conduct towards Plaintiff.  First, Vandenberg asserts that Plaintiff was eighteenth in seniority and her requested days off were taken by more senior officers.  (Pl.s' Opp. Ex. E at 42-43, June 25, 2012.)  Additionally, Vandenberg maintains that all officers were required to use their vacation days in blocks of five pursuant to a department policy.  (*Id.* at 46-47.)  Finally, with respect to the muster time uniform violations, Vandenberg claims that he was enforcing basic discipline.  (*Id.* at 22.)

Plaintiff claims that she was also discriminated against on the basis of gender by Deputy Chief Joseph Nolan.[6]  First, Plaintiff claims that Nolan had her suspended for leaving Atlantic City without permission, even though according to Plaintiff this was common practice and no other officer received discipline for similar conduct.  (Pl.'s S.A.M.F. ¶ 35.)  Second, Nolan reprimanded Plaintiff for her posture during roll call (*Id.* ¶¶ 80-83.), and  Plaintiff maintains that such conduct routinely went unpunished.  (*Id.*)  Third, Nolan singled Plaintiff out for addressing a Sergeant by his first name, even though Plaintiff

---

[6] While Plaintiff claims that Nolan discriminated against her based on her sex, she also claims that Nolan treated her unfairly based on the mistaken belief that she had authored false reports regarding an incident where Nolan used pepper spray on a moving vehicle during a pursuit.  (Pl.'s S.A.M.F. ¶ 31.)

4

asserts that it was common to do so.[7] (*Id.* ¶ 79). Finally, Nolan assigned Plaintiff to traffic post as punishment for submitting inadequate log sheets. (*Id.* ¶ 90, 92.) Plaintiff contends that most officers on her shift did not submit log sheets at all, and those who did were never punished with traffic post for poor quality. (*Id.* ¶¶ 89-90.) Nolan, however, asserts that he has no problem with female officers, and enforces the same rules and policies with respect to every officer. (Pl.'s Opp., Ex. D at 88, 91, June 25, 2012.)

Finally, Plaintiff claims gender discrimination and sexual harassment at the hands of Chief John Mooney. First, Plaintiff contends that Mooney forced her to serve suspensions even though male officers had the option to instead forfeit sick or vacation days. (Pl.'s S.A.M.F. ¶¶ 38-39.) Second, while attending a funeral for Mooney's nephew, Mooney allegedly touched Plaintiff inappropriately. (*Id.* ¶ 42.) After doing so, another officer allegedly commented "we all love Clayton's ass," to which Mooney allegedly responded, "that's the only thing she has going for her. Everyone would follow her anywhere with an ass like that." (*Id.* ¶ 42-43.) Third, after Plaintiff was head-butted by a prisoner, and requested that he be charged, Mooney told her "had you known to keep your mouth shut, you would not have been head-

---

[7] Plaintiff asserts that she personally witnessed officers call Nolan by his nicknames, Bo or Bobo.

butted." (*Id.* ¶ 41.)  Finally, Plaintiff asserts that as Chief, Mooney had a duty to stop Vandenberg and Nolan from harassing Plaintiff, but failed to do so.  (*Id.* ¶¶ 45-47.) Mooney however, denies all of Plaintiff's accusations.  (Pl.'s Opp., Ex. C at 52, 53, 62, 66-68, June 25, 2012.)

Plaintiff also identifies several other incidents of alleged gender discrimination and sexual harassment.  Former Sergeant Eric Dooley, who is Plaintiff's ex-boyfriend, allegedly transferred Plaintiff to another detail resulting in a three percent pay decrease.  (Pl.'s S.A.M.F. ¶¶ 18-19.)  Sergeant Rodney Ruark allegedly disciplined Plaintiff for conduct at grand jury, which Plaintiff claims has never happened to male officers.  (*Id.* ¶¶ 76-78.)  Sergeant Ruark also allegedly made inappropriate comments about Plaintiff to other police officers.  (*Id.* ¶¶ 25-26).  Sergeant David Madamba allegedly reprimanded Plaintiff for not holding her rifle correctly even though several male officers held their rifles the same way.  (*Id.* ¶¶ 84-87.)  At a crime scene, Captain Fair allegedly stated that Plaintiff should have gotten the door for other officers instead of securing a prisoner because Plaintiff is "just a girl."  (*Id.* ¶ 93.)

At all relevant times, the ACPD had a policy regarding sexual harassment and gender discrimination.  (Pl.'s Opp., Ex. A at 18-19, June 25, 2012; Def.'s Br., Ex. 18.)  Pursuant to this policy, ACPD employees were required to be trained on issues of

6

sexual harassment and gender discrimination.  (Def.'s Br., Ex. 18.)  While neither party introduced any evidence as to the specific details of the training sessions, Chief Mooney testified that he received training on these issues around a dozen times during his career.  (Pl.'s Opp., Ex. C at 70-72.)  Mooney further testified that ACPD supervisors receive additional training once they attain the rank of Sergeant.  (*Id.*)

Plaintiff initiated the instant litigation by filing her Complaint on June 23, 2009.  Plaintiff named Mooney, Nolan, Vandenberg, and Atlantic City as Defendants.  Pursuant to an Order and Opinion dated June 30, 2010, this Court granted Defendants' Motion to Dismiss all claims against the individual Defendants and several claims against Atlantic City.[8]  Remaining in this action are claims against Atlantic City for hostile work environment sexual harassment and unlawful employment practices pursuant to the NJLAD, and failure to train pursuant to 42 U.S.C. § 1983 ("§ 1983").  Pending before the Court is Defendant Atlantic City's Motion for Summary Judgment.

## II.

"[S]ummary judgment is proper 'if the pleadings,

---

[8] This Court granted Defendant's Motion to Dismiss with respect to the following claims: Count I (CEPA claim), Count II (NJLAD sexual harassment claim with respect to the individual Defendants), Count IV (§ 1983 First Amendment retaliation claim), Count V (§ 1983 procedural due process claim), and Count VII (policy indifferent to constitutional rights claim).  (Ct. Order, June 30, 2010.)

7

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing that no genuine issue of material fact remains.  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a

situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.

A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson,* 477 U.S. at 252.

### III.

The Court will first consider Plaintiff's § 1983 claim before turning to Plaintiff's NJLAD claims.

**A.  Failure to Train**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

A municipality or other local government can be subject to liability as a "person" under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be

9

subjected' to such deprivation." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). However, municipalities or other local governments are not vicariously liable under § 1983 for the actions of their employees; instead, they are "responsible only for 'their own illegal acts.'" *Id.* Consequently, "plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.*

The Supreme Court has stated that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id*. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. Therefore, to establish liability based on a failure to train, a plaintiff "must identify a failure to provide specific training that has a causal nexus with [the] injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005)(internal quotations and citation omitted). In other words, a plaintiff "must identify specific

10

training or policies that would prevent the harm and show that 'the risk reduction . . . is so great and so obvious that failure of those responsible for the content of the training to provide [the plaintiff's proposed training] can reasonably be attributed to a deliberate indifference.'" *Marshall v. Koochembere*, 2010 WL 5315916, at *4 (D.N.J. Dec. 20, 2010) (alteration in original) (citing *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005)).

The Complaint in the present case asserts that Atlantic City failed to adequately train its police officers regarding sexual harassment, causing violations of Plaintiff's constitutional rights. (Compl., Count 6 ¶ 3, June 23, 2009.)  Plaintiff, however, fails to put forth any evidence of specific training that would have prevented her injuries in this case.  The only evidence regarding training that Plaintiff points to in support of her failure to train claim is Chief Mooney's testimony that he has been trained around a dozen times on issues of sexual harassment and gender discrimination throughout his career. (Pl.'s Opp., Ex. C at 70-72.)  While Plaintiff characterizes this amount of training as insufficient, she does not provide any evidence of "specific additional training measures that would have resulted in a 'risk reduction . . . so great and so obvious that failure of those responsible for the content of the training to provide [the plaintiff's proposed training] can reasonably be

11

attributed to deliberate indifference.'" *Marshall*, 2010 WL 5315916, at *4 (alterations in original) (citing *Woloszyn*, 396 F.3d at 325). Therefore, no reasonable jury could find that the Plaintiff's alleged injuries had a "causal nexus" with the failure to provide a specific training or that the failure to provide this training reflects Atlantic City's "deliberate indifference" to Plaintiff's rights. As a result, the Defendant's motion for summary judgment is granted as to Plaintiff's § 1983 claim.

**B.   NJLAD Claims**

**1.   Failure to Take Remedial Action**

The Complaint also alleges that Atlantic City violated the NJLAD based on its failure to take remedial action despite having notice of the claimed harassment. (Compl., Count III ¶ 3-4.) The Supreme Court of New Jersey has stated that an employer can be held liable for sexual harassment committed by employees if the employer was negligent in not having an effective policy against sexual harassment. *See Lehmann v. Toy's R Us, Inc.*, 132 N.J. 587, 621 (1993). Thus, "when an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." *Payton v. N.J. Tpk. Auth.*, 148 N.J. 524, 536 (1997)(quoting *Lehmann.*, 132 N.J. at 623). While the presence of such measures does not automatically demonstrate

12

the absence of negligence, "the existence of effective preventative mechanisms provides some evidence of due care on the part of the employer." *Lehmann*, 132 N.J. at 621. In addition, "while the effectiveness of an employer's remedial steps relates to an employee's claim of liability, it is also relevant to an employer's affirmative defense that its actions absolve it from all liability." *Payton*, 148 N.J. at 536-37.

"Effective remedial measures are those reasonably calculated to end the harassment." *Lehmann*, 132 N.J. at 623. Furthermore, the presence or absence of the following elements serves as a guideline to determine whether remedial measures are effective:

> [(1)] policies; [(2)] complaint structures, and that includes both formal and informal structures; [(3)] training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; [(4)] some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and . . . [(5)] unequivocal commitment from the top that is not just in words but backed up by consistent practice.

*Id.* at 621. The presence or absence of such programs is not in itself dispositive of employer liability; however, it serves as a strong indicator for whether an employer upheld its duty to remedy allegations of harassment. *See Id.* at 621-22.

In the present case, the Court finds that Plaintiff has not put forth sufficient evidence from which a reasonable jury could conclude that the ACPD was negligent in not having an effective policy against sexual harassment. It is undisputed that during

13

the time of the claimed violations, the ACPD had General Order Number 8 of 2004 ("General Order 8"), which provided formal complaint structures to remedy sexual harassment. (Def.'s 56.1 Stat. ¶ 21.) General Order 8 mandated training for ACPD employees, (Def.'s Br., Ex. 18.) and Mooney testified that he was trained around a dozen times during his career, and that officers receive additional training once they attain the rank of Sergeant. (Pl.'s Opp., Ex. C at 70-72.) In addition, Plaintiff testified that she was aware of and had reviewed General Order 8. (Def.'s 56.1 Stat. ¶ 18.)

Plaintiff has put forth no evidence from which a reasonable jury could conclude General Order 8 was ineffective. While Plaintiff claims that filing a report would have been useless, she does so based on the unsupported assertion that department policies are frequently violated with impunity. (Pl.'s Opp., Ex. A at 21-22.) Moreover, even though Plaintiff never filed an official report, Internal Affairs still investigated Plaintiff's claims, resulting in the conclusion that Plaintiff's allegations were baseless. (Def.'s Br., Ex. 19.) Because Plaintiff has presented no evidence to suggest that Atlantic City failed to take effective remedial action, Atlantic City's Motion will be granted with respect to Plaintiff's NJLAD claim for failure to take remedial action.

**2. Hostile Work Environment Sexual Harassment**

Finally, the Complaint contends that Atlantic City committed hostile work environment sexual harassment due to its inaction in the face of sexual harassment and gender discrimination by its employees.  (Compl., Count II ¶¶ 3-4.)  Sexual harassment jurisprudence identifies two categories of sexual harassment  - quid pro quo sexual harassment and hostile work environment sexual harassment.  *See Lehman*, 132 N.J. at 601.  Quid pro quo sexual harassment "occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment. It involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences."  *Id*.  In contrast, hostile work environment sexual harassment "occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile."  *Id*.  Plaintiff is only claiming that she suffered hostile work environment sexual harassment in this case.  (Pl.'s Resp. ¶ 7.)[9]

To succeed on this claim, Plaintiff must present evidence showing that: "the complained of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or

---

[9] References to "Pl.'s Resp." are to Plaintiff's Responding Statement of Material Facts which accompanied Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment.

pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Lehmann* 132 N.J. at 603-04 (emphasis omitted). When assessing whether the conduct is sufficiently severe or pervasive, courts must view "the totality of the relevant circumstance, which involves examination of (1) the frequency of all the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Godfrey v. Princeton Theological Seminary*, 196 N.J. 178, 196 (2008)(internal quotations and citations omitted).

Whether or not an employer is liable for its employees' actions is governed by agency principles. *See Lehmann*, 132 N.J. at 619. Therefore, an employer is liable for its employees' actions done within the scope of their employment. *Id.*

In support of her hostile work environment claim, Plaintiff testified that the following conduct was sufficiently severe or pervasive such that a reasonable woman would believe that the conditions of her employment were altered and her working environment became hostile or abusive: (1) Plaintiff's superior changed her days off and vacation days; (2) Plaintiff was spoken to about uniform violations; (3) Plaintiff received a one day suspension for violating a department rule against leaving

16

Atlantic City without permission while on duty; (4) Plaintiff was spoken to regarding her posture at roll call; (5) Plaintiff was spoken to for addressing a Sergeant by his first name; (6) Plaintiff was assigned to traffic post for submitting inadequate log sheets; (7) Plaintiff was required to serve suspensions instead of forfeiting sick or vacation days; (8) Plaintiff was transferred to another detail resulting in a three percent pay decrease; (9) Plaintiff was spoken to for improper conduct at grand jury; (10) Plaintiff was spoken to for carrying her rifle incorrectly; (11) Plaintiff was told that she should have allowed a male officer to secure a prisoner at a crime scene; and (12) Plaintiff alleges isolated incidents of derogatory comments made over the course of several years.

    Viewing the evidence most favorably to Plaintiff, the Court finds that the complained of conduct was insufficiently severe or pervasive to support a claim for hostile work environment. "It is the harassing conduct that must be severe or pervasive, not its effect on the plaintiff or on the work environment." *Lehmann*, 132 N.J. at 606. Looking at the evidence objectively, the complained of conduct occurred in the form of isolated incidents over a period of many years and most often had a legitimate disciplinary motivation. It follows that independent of Plaintiff's subjective reaction, the alleged harassment does not rise to a level such that a reasonable woman would see

17

Plaintiff's working environment as hostile.  *Cf. Johnson v. State, Div. Of State Police*, No. L-811-05, 2012 WL 385411, *11 (N.J. Super. Ct. App. Div. Feb. 8, 2012)(holding that isolated incidents of discourtesy, rudeness, and off-hand comments are not actionable as hostile work environment racial harassment); *Armstrong v. City of Jersey City*, No. L-4031-08, 2012 WL 163007, *7 (N.J. Super. Ct. App. Div. Jan. 20, 2012)(holding that feeling disrespected as a police officer cannot support a claim for hostile work environment racial harassment).  Accordingly, Atlantic City's Motion will be granted with respect to Plaintiff's claim for hostile work environment sexual harassment pursuant to the NJLAD.

**IV.**

For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby granted in full.  An appropriate Order will accompany this Opinion.

Dated: October 22, 2012             S/Joseph Irenas
                                    **Joseph E. Irenas, S.U.S.D.J.**